FILED
SUPERIOR COURT
OF GUAM

2018 FEB 22 P 4: 27

CLERK OF COURT

BY:_____

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| **ROSEANA E.D. PALMER,** | ) **Case No. CV0709-13** |
| Plaintiff, | ) |
| vs. | ) |
| | ) **FINDINGS OF FACT AND** |
| **MARIANA STONES CORPORATION** | ) **CONCLUSIONS OF LAW** |
| and **DOES 1** through **10,** | ) |
| Defendants. | ) |

## INTRODUCTION

This matter came before the Honorable Alberto C. Lamorena, III for a bench trial[1] on September 20, 2017 concerning a complaint for breach of contract filed by Roseana E.D. Palmer ("Plaintiff" or "Mrs. Palmer") against Mariana Stones Corporation[2] ("Defendant" or "MSC"). Attorney Genevieve P. Rapadas represents Plaintiff and attorneys Peter C. Perez and Edward C. Han represent Defendant. Having duly considered the parties' briefs, oral arguments, evidence and testimony received during trial, and the applicable law, the Court now issues the following Findings of Fact and Conclusions of Law ("Findings").

---

[1] The Court took the matter under advisement on October 25, 2017, which was the deadline for the filing of replies to the parties' proposed findings.

[2] Mr. Soo Young Kim, who currently serves as the Chief Executive Officer of MSC, was present and provided testimony during the bench trial.

**ORIGINAL**

## FINDINGS OF FACT

## I. Extraction Lease and Construction Agreement

1. Mrs. Palmer and MSC executed an Extraction Lease and Construction Agreement ("Agreement") on September 3, 2011.

2. The Agreement was signed by Mrs. Palmer and the President of MSC, who at the time was Mr. Rich Huh ("Mr. Huh").

3. The purpose of the Agreement was to lease property owned by Mrs. Palmer to MSC.

4. The terms of the Agreement explicitly establish a lessor/lessee relationship, therein identifying Mrs. Palmer as the lessor and MSC as the lessee.

5. MSC was to utilize the leased property for the extraction and removal of mineral materials, i.e. aggregate, for a term of five (5) years until August 31, 2016.

6. The property identified in the Agreement is Lot 3-2, Tract 34000, Dededo, Guam ("Lot 3-2" or "Property"). Lot 3-2 is located in an area known as Urunao.

7. As consideration for the lease, MSC was to, *inter alia*, pay Mrs. Palmer $50,000 on March 1, 2012. Thereafter, beginning on June 1, 2012, MSC was to pay Mrs. Palmer a minimum of $8,000 per month in rent for the remaining term of the Agreement. Pursuant to the terms of the Agreement and the negotiations between the parties, the minimum payment of $8,000 per month in rent from MSC was unconditional.

8. The Agreement provided alternative mechanisms for determining monthly rent based either on the amount of actual aggregate extracted from the property and the expected usable/actual usable aggregate. Specifically, in any given month, if the actual aggregate removed at the established rate of two dollars ($2.00) per cubic yard resulted in an amount in excess of the minimum lease rent for that month, beginning with the June 1,

2012 payment, then the higher of the two amounts will be paid for that month. Furthermore, MSC was to pay the higher amount between the expected usable aggregate (which was 403,102 cubic yards and totaling $806,204.00) and the actual usable aggregate removed during the entire term of the lease agreement based on the rate of two dollars ($2.00) per cubic yard.

9. The Agreement also contains provisions, specifically, paragraphs 3(e) and 7(f), requiring MSC to obtain all the necessary permits needed to conduct its operations on the leased property.

10. The Agreement provides for attorneys' fees and costs to the prevailing party in a legal proceeding between the parties.

## II. Property & Easement

11. Mrs. Palmer owns Lot No. 3-2, which she obtained via a Quitclaim Deed of Gift on August 5, 2009.

12. The Property is located three-quarters of a kilometer south of the Guam National Wildlife Refuge ("GNWR"), which is identified as Lot. 10081-2 and owned and managed by the U.S. Fish and Wildlife Service ("FWS").

13. At or near the entrance of the GNWR, there is a sign ("Refuge Sign") which states as follows: "Entering Guam National Wildlife Refuge Special regulations apply".

14. Lot No. 3-2 is accessible via a right of way named Chalan Urunao, which passes thru property – the GNWR – via an easement ("Easement").

15. The Easement was granted in 1994 to the landowners of Urunao pursuant to a Consent Decree and Judgment ("Consent Decree") issued by the U.S. District Court of Guam in U.S. v. Antonio Artero Sablan et al., CV 93-00041.

16. In order for an automobile to access the Property, it must travel through the GNWR via the Easement.

17. At some time prior to September 3, 2011, MSC's President, Mr. Huh, and Vice President, Paul Lee ("Mr. Lee"), first entered upon and passed over the Easement.

18. At some time prior to September 3, 2011, Mr. Huh and Mr. Lee saw the Refuge Sign.

19. For the duration of the Agreement, Chalan Urunao was the only right of way by which an automobile can access the Property.

20. The Refuge Sign was seen by Mrs. Palmer prior to entering the Agreement.

21. Prior to executing the Agreement, neither MSC nor Mrs. Palmer were aware of the specific permit requirements needed to traverse the easement and access the Property.

## III. Events After the Parties Executed the Agreement

22. After the Agreement was executed, Mrs. Palmer transferred the Property to MSC.

23. At some point in mid to late 2012, the FWS informed MSC that they needed to obtain a special use permit in order for its trucks to traverse the Easement to transport aggregate.

24. MSC thereafter applied for a special use permit from FWS to transport aggregate through the GNWR via the easement. MSC also submitted a revised safety plan to FWS for their consideration.

25. MSC's application for a special use permit was reviewed and rejected by Joseph Schwagerl ("Mr. Schwagerl"). Mr. Schwagerl is an employee of the FWS and is the Refuge Manager for the GNWR. MSC did not appeal the denial of their application for a special use permit.

26. Without a special use permit, MSC continued to transport aggregate over the Easement resulting in at least twenty (20) violation notices being issued by the FWS.

27. According to the violation notices issued by FWS, Defendants violated 50 C.F.R. § 27.97 which states that "[s]oliciting business or conducting a commercial enterprise on any national wildlife refuge is prohibited except as may be authorized by special permit." 50 C.F.R. § 27.97.

28. As a result of the denial of the special use permit and threats of legal actions by the FSW for continued use of the right of way, MSC ceased extracting aggregate from the Property.

29. On May 13, 2013, the U.S Attorney's Office for the Districts of Guam and the N.M.I. ("USAO") provided the parties with four alternatives to access the Property.

30. MSC made payments to Mrs. Palmer in the amount of $10,000 on April 2, 2012 and $40,000 on August 27, 2012, which was required pursuant to Addendum A of the Agreement.

31. From June 1, 2012 to the August 31, 2016, MSC failed to make the required monthly payments of the higher of either $8,000.00 per month or the actual aggregate removed at the rate of two dollars ($2.00) per cubic yard.

32. To date, MSC has only extracted about 300 cubic yards of aggregate from the Property.

## CONCLUSIONS OF LAW

### I. Remaining Issues Following Motion for Summary Judgment

A. As a preliminary matter, the Court notes that there has already been a finding that Mrs. Palmer has met her burden on summary judgment with regard to the essential elements of her breach of contract claim against MSC. (Dec. and Order at 9:15-18, June 20, 2014.) Therefore, the Court does not need to address in these Findings whether there

was a breach of contract as this issue has already been adjudicated.[3] The only matter left for this Court to determine is whether MSC's failure to perform pursuant to the Agreement was excused vis-à-vis the affirmative defenses asserted and not waived.

B. Pursuant to Rule 8(c) of the Guam Rules of Civil Procedure, a party is required to set forth their affirmative defenses in their pleadings. Guam R. Civ. P. 8(c). In Citizens Security Bank v. Bidaure, 1997 Guam 3 ¶ 10, the Supreme Court of Guam ("Supreme Court") stated that affirmative defenses not included in the pleadings are waived.

C. During the bench trial on September 20, 2017, Defendant raised the following affirmative defenses: (1) frustration of purpose, (2) impossibility, (3) intervening and superseding causes outside and beyond Defendant's control and (4) impracticability, as well as other defenses previously excluded by the Court.

D. The Court previously determined that "in denying Plaintiff's Motion for Summary Judgment, and finding issues of fact pertaining to those two affirmative defenses [those being Frustration of Purpose and Impossibility], the Court set forth the issues to be determined at trial, namely, foreseeability, as it applied to Frustration of Purpose and Impossibility." (Dec. and Order, 7:9-12, Jan. 9, 2015.)

E. The Court also excluded "any evidence or arguments that Defendant may present in support of a force majeure and/or failure to mitigate damages defense."[4] (Dec. and Order, 9:9-10, Jan. 9, 2015.) The basis for the exclusion was that allowing evidence regarding these specific affirmative defenses would be prejudicial to Plaintiff

---

[3] In their respective trial briefs, both parties recognized that the scope of trial was limited to the affirmative defenses raised by MSC. Thus, the Court will not entertain attempts by MSC to litigate matters outside the scope of the trial in their proposed findings.

[4] This Court subsequently denied a motion to set aside the decision regarding the motion in limine to exclude certain evidence and arguments regarding affirmative defenses.

particularly given MSC's failure to raise such defenses in their Answer. (<u>Id.</u> at 7:18-20; 9:5-6.)

F.  Therefore, the Court will only consider the affirmative defenses of frustration of purpose and impossibility/impracticability.[5] Allowing MSC to raise affirmative defenses during trial that have been previously waived or abandoned would prejudice Mrs. Palmer considering the previous decisions in this matter outlining the issues for trial.

## II. Affirmative Defense – Frustration of Purpose

G.  A contracting party's performance on a contract may be excused if they are able to establish the defense of frustration of purpose, also known as commercial frustration.

H.  As previously determined by this Court, to establish the defense of commercial frustration: "1) the basic purpose of the contract, which has been destroyed by the supervening event, must be recognized by both parties to the contract, (2) the event must be of a nature not reasonably to have been foreseen and the frustration must be so severe that it is not fairly to be regarded as within the risks that were assumed under the contract, and (3) the value of counter performance to the promisor seeking to be excused must be substantially or totally destroyed." <u>Peoplesoft U.S.A., Inc. v. Softeck, Inc.</u>, 227 F. Supp.2d 1116, 1119-1120 (2002) (internal citations omitted).

I.  Based on the evidence produced at trial, MSC has not met its burden in proving any of the elements required to show that the purpose of the Agreement was frustrated as a result of the FWS's actions.

---

[5] Considering the evidence presented, the Court believes that the facts used to support the affirmative defenses of frustration of purpose and impossibility/impracticability serve as the basis for the defense asserted by MSC of "intervening and superseding causes outside and beyond Defendant's control." As the Court believes this defense is a reiteration of the defenses of frustration of purpose and impossibility/impracticability, the parties are directed to those specific sections in these Findings.

J.  First, MSC has not adequately demonstrated that the basic purpose of the Agreement was recognized by both parties. Rather, the parties disagree as to the basic purpose of the Agreement. For example, Mrs. Palmer asserts that the purpose in entering the Agreement was to be paid monthly rent by leasing the Property. Defendant, however, states that the basic purpose of the Agreement was to extract, remove, and sell materials taken from Mrs. Palmer's property. Although there is no doubt that MSC was to utilize the property to extract aggregate, the explicit purpose of the Agreement was to establish a lessor/lessee relationship between the parties whereby MSC was to pay Mrs. Palmer rental payments for lease of the property.

K.  Second, the superseding event purportedly causing the frustration of the purpose of the Agreement was reasonably foreseeable because the Refuge Sign posted at the entrance to the GNWR provided notice to those traversing the right of way that special regulations apply. <u>Lloyd v. Murphy</u>, 25 Cal. 2d 48, 54 (1944) (stating that a party seeking to excuse himself from performance of his obligation must prove that the risk of the frustrating event was not reasonably foreseeable).

L.  The Refuge Sign provided adequate notice to MSC that there are restrictions for use of the right of way, such as the requirement that "[s]oliciting business or conducting a commercial enterprise on any national wildlife refuge is prohibited except as may be authorized by special permit." 50 CFR § 27.97. The Refuge Sign was also clearly visible and seen by officers of MSC prior to execution of the Agreement. Thus, MSC had actual notice of the existence of regulations for traversing the right of way and thereafter assumed the risk by not including into the Agreement any contractual safeguards against the possible denial by the FWS of a special use permit to use the

easement for the transport of aggregate pursuant to those regulations. <u>See</u> <u>Gander Mountain Co. v. Islip U-Slip LLC</u>, 923 F. Supp. 2d 351, 361 (2013) ("[i]f a party could reasonably foresee an event that would destroy the purpose of the contract, and did not provide for the event's occurrence, then the party will be deemed to have assumed the risk").

M. The Agreement further put the burden on MSC to "to secure government permits needed to facilitate work on the Property." (Stipulated Joint Trial Ex. 19 at ¶ 13.) Because of this requirement, MSC knew that it needed to obtain permits and accepted the contractual responsibility for obtaining the necessary permits.

N. Lastly, MSC has not sufficiently demonstrated that the value of counter performance, which they are seeking to be excused from, was substantially or totally destroyed. As previously determined, the USAO provided the parties with four alternatives to access the Property without having to obtain a special use permit for traversing the Easement. <u>See</u> <u>Lloyd</u>, 25 Cal. 2d at 56 ("if governmental regulation does not entirely prohibit the business to be carried on in the leased premises but only limits or restricts it, thereby making it less profitable and more difficult to continue, the lease is not terminated or the lessee excused from further performance"). MSC was aware of all these alternatives and did not present any evidence to refute that the alternatives existed, or that pursuing these alternatives would have been expensive, burdensome, or impossible.

## III. Affirmative Defense – Impossibility/Impracticability

O. Like frustration of purpose, the defense of impossibility requires a showing that the supervening event was not foreseeable, that event being the FWS's denial of a special

use permit for MSC authorizing them to traverse the Easement with aggregate taken from the Property.

P. "[T]he doctrine of frustration of purpose is akin to the doctrine of impossibility of performance", the only difference being that impossibility requires a showing of "physical impossibility but also cases of extreme impracticability" while frustration of purpose only requires a showing that the value of the contract was substantially or totally destroyed. <u>Lloyd</u>, 25 Cal. 2d at 53.

Q. Accordingly, the determination already made herein that the supervening event was of a reasonably foreseeable nature also precludes MSC's impossibility/impracticability defense. It also cannot be said that performance was impossible/impracticable given the USAO's recommendation to the parties of alternatives to access the Property without having to traverse the Easement.

## IV. Damages

R. As MSC is unsuccessful in maintaining the affirmative defenses asserted and analyzed by this Court, their failure to make minimum monthly payments to Mrs. Palmer under the Agreement was not excused.

S. Mrs. Palmer has requested for damages in the amount of $806, 204, which represents the expected usable aggregate of 403,102 cubic yards that was estimated to be extracted from the property for the entire term of the lease agreement at the established rate of two dollars ($2.00) per cubic yard.

T. The Court, however, does not believe damages in this amount are reasonable as only about 300 cubic yards of aggregate was extracted from the Property.

U. Pursuant to the expressed terms of the Agreement, Mrs. Palmer is owed a minimum of $8,000 per month in rent from MSC, unconditionally, beginning on June 1, 2012 through August 31, 2016.

V. MSC therefore is liable in the amount of $408,000 (51 months (June 1, 2012 – August 31, 2016) x $8,000 minimum monthly rent) for the damages suffered by Mrs. Palmer as a result of MSC's unexcused breach. This amount represents the amount of rent that Mrs. Palmer lost as a result of MSC's breach of the Agreement.

W. Mrs. Palmer is also entitled to pre and post-judgment interests on the amounts owed by MSC for its breach at a rate of six (6) percent per annum. <u>See</u> 20 G.C.A. § 2110; 18 G.C.A. § 47106.

X. The Court believes this amount most adequately represents the amount of damages suffered by Mrs. Palmer as a result of MSC's breach.

## V. Attorneys' Fees and Costs

Y. In determining whether to award attorneys' fees to a party, courts in United States jurisdictions, including Guam, apply what is commonly referred to as the "American Rule." <u>Fleming v. Quigley</u>, 2003 Guam 4 ¶ 35 ("the American Rule applies in Guam"). "Under the American Rule, parties bear their own litigation expenses, including attorney's fees." <u>Id.</u> at ¶ 7. There are several exceptions to the American Rule which include matters "where attorney's fees are: (1) authorized by statute, (2) authorized by contract, or (3) allowed in judicially-established circumstances." <u>Id.</u>

Z. Here, there exists a provision relative to attorneys' fees in the Agreement. The provision states as follows: "[i]f one party to this Lease institutes legal proceedings against the

other party, the prevailing party shall be entitled to recover reasonable attorney fees and court costs from the other party." (Stipulated Joint Trial Ex. 19 at ¶ 13.)

AA.      Accordingly, the Court finds that attorneys' fees to a "prevailing party" are authorized by virtue of the Agreement signed between Mrs. Palmer and MSC.

BB.      As MSC has not been successful in asserting the affirmative defenses discussed herein, the Court finds that Mrs. Palmer is the prevailing party in this litigation and is entitled to attorneys' fees and court costs.

## CONCLUSION

Based on the above Findings of Fact and Conclusions of Law, the Court finds in favor of Mrs. Palmer in the amount of $408,000.00 for breach of contract, plus pre and post-judgment interest, and attorney's fees and costs. Mrs. Palmer shall submit to the Court, within two weeks of the date hereof, a tabulation of attorneys' fees and costs she incurred. Thereafter, Judgment shall be entered accordingly.

**IT IS SO ORDERED** on this 22nd day of February, 2018.



—————————————————————
**HONORABLE ALBERTO C. LAMORENA, III**
**Presiding Judge, Superior Court of Guam**

SERVICE VIA COURT BOX
I acknowledge that a copy of the
original hereon was placed in the
court box
G. APPADAS          P.C. Perez
ICP THAN
2/22/18 rs
ANTHINA
Deputy Clerk of the Court